**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **DEANTE GHOLSTON,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No: 5:13-cv-00444 (MTT)** |
| | : | |
| **CARL HUMPHREY, et al.,** | : | **Proceedings Under 42 U.S.C. § 1983** |
| **Defendants.** | : | **Before the U.S. Magistrate Judge** |

## REPORT & RECOMMENDATION

Plaintiff Deante Gholston brings claims pursuant to 42 U.S.C. § 1983 against Defendants Bishop, Clupper, Cooper, Daniels, Hill, Humphrey, Jackson, Kyles, Mabry, Means, O'Neal, Russo, Walters, Wesley, Wilkins, Williams, and Walker, alleging that the Defendants violated his constitutional rights during three separate instances of alleged excessive force while confined at Georgia Diagnostic and Classification Prison ("GDCP"), as a Tier III inmate in the Special Management Unit. See Doc. 1. Currently before the Court are cross-motions for summary judgment filed by Plaintiff and Defendants Bishop, Clupper, Cooper, Daniels, Hill, Humphrey, Jackson, Kyles, Mabry, Means, Oneal, Russo, Walters, Wesley, Wilkins, Williams, and Walker. Docs. 142, 161, 162. For the reasons stated below, it is **RECOMMENDED** that the Motion for Summary Judgment of Defendants Bishop, Clupper, Cooper, Daniels, Hill, Humphrey, Jackson, Kyles, Mabry, Means, Oneal, Russo, Walters, Wesley, Wilkins, and Williams' be **GRANTED in part**, as to Plaintiff's supervisory liability claims and requests for injunctive relief against Bishop and Humphrey; that Plaintiff's Motion for Summary Judgment be **DENIED**, and that the case proceed to trial on Plaintiff's excessive force and failure to intervene claims.

It is **FURTHER RECOMMENDED** that Defendant Walker's Motion for Summary Judgment be **GRANTED**.

## I.   LEGAL STANDARD

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. However, there must exist a conflict in substantial evidence to pose a jury question." See *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986), and *Verbraeken v. Westinghouse Elec. Corp*., 881 F.2d 1041, 1045 (11th Cir. 1989).

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law. See *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See *id*. (citing *Celotex v. Catrett*, 477 U.S. 317, 322–23 (1986)). In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. *Peek–A–Boo Lounge of Bradenton, Inc. v. Manatee Co., Fla*., 630 F.3d 1346, 1353 (11th Cir. 2011).

## II.   BACKGROUND

The Plaintiff, Deante Gholston, is an inmate in the Special Management Unit[1] of the

---

[1] The SMU is the unit housing maximum security inmates in the Georgia Department of Corrections. Aff. of Mary

Georgia Diagnostic and Classification Prison in Jackson, Georgia, to which he was moved in 2011. Pl.'s Dep. 45, 6-9. His claims are based on three separate incidents involving the use of force during 2012. Doc. 1, p. 7. The first incident occurred on February 3, 2012, the second on February 22, 2012, and the third on December 5, 2012.

**A. February 3, 2012**

In his first claim, Plaintiff alleges that on February 3, 2012, Defendant Kyles held Plaintiff down while Defendant Hill slammed Plaintiff's head into the ground five times, and then punched Plaintiff three times. Doc. 1, p. 8; Doc. 34, p. 2. Plaintiff further alleges that Defendants Cooper, O'Neal, and McMillian, were present, but that they made no attempt to intervene.

At his deposition, Plaintiff testified that the incident began while Plaintiff was being escorted to the shower by two officers. Officer Hill asked Plaintiff "why he had told on [Officer Daniels]?" Pl.'s Dep. 54, 4-9. Plaintiff told Hill to mind his "own damn business." Pl.'s Dep. 54, 11. Upon returning from the shower, Officer Hill squeezed Plaintiff's arm. Pl.'s Dep. 55, 1-2. Plaintiff asked for Officer Hill to stop squeezing his arm. Pl.'s Dep. 55, 2-6. Officer Hill kept squeezing Plaintiff's arm after Plaintiff asked him to stop. Pl.'s Dep. 55, 1-6. Officer Hill then squeezed Plaintiff's arm more tightly and forced his fingernails into Plaintiff's arm, while verbally antagonizing Plaintiff. Pl.'s Dep. 55, 7-13. Once the group arrived at Plaintiff's cell, Plaintiff slipped out of his handcuffs, using a concealed razor, and punched Officer Hill in the nose with his free hand and the attached handcuff. Pl.'s Dep. 55, 14-21; Pl.'s Dep. 62, 15-16; Pl.'s Dep. 97, 1-4. Officer Hill stood in a daze, startled by Plaintiff's assault. Pl.'s Dep. 55, 21. Plaintiff then came out of his cell, and started swinging at both Officer Hill and Officer McMillan. Pl.'s Dep. 55, 22-24. As Plaintiff had the "element of surprise," the Officers began hitting each other, instead of the Plaintiff. Pl.'s Dep. 56, 10-13.

---

Gore, LPN, Doc. 161-7, p. 2.

Realizing that Plaintiff was out of his cell, Officers Cooper and O'Neal, among others—"about eight or nine" officers in total, arrived to restrain Plaintiff. Pl.'s Dep. 56, 21-25. The officers forced Plaintiff to the ground. Pl.'s Dep. 57, 8. Defendants Hill, Kyles, and Cooper, held Plaintiff down and placed irons on his legs and cuffed his hands. Pl.'s Dep. 57, 8-13. Once Plaintiff was confined, Defendant Hill grabbed Plaintiff's head and started slamming it hard on the concrete. Pl.'s Dep. 60, 9-17. Defendant Hill proceeded to "slam" Plaintiff's head into the floor five times. Pl.'s Dep. 60, 21-22.[2] Plaintiff's head started to bleed from the trauma. Pl.'s Dep. 60, 21-22. Defendant Hill then punched Plaintiff in the face three times and spit on Plaintiff. Pl.'s Dep. 60, 22-23. Following the punches, the other officers began to restrain Defendant Hill. Pl.'s Dep. 61, 1. Plaintiff estimates that the whole incident took 35 to 45 seconds. Pl.'s Dep. 81, 19-20.

Immediately after the incident, Plaintiff was escorted to medical where his wounds were cleaned and covered in gauze. Pl.'s Dep. 79, 17-19. Photos of Plaintiff following the injury reveal a deep gash in his nose (Aff. Of June Bishop, Att. A (Doc. 161-4, pp. 8, 12)), and gashes above his eye (id. at 22, 24). Plaintiff received sixteen stitches from medical the next day. Pl.'s Dep. 80, 4-5. The wound was over Plaintiff's left eye. Pl.'s Dep. 98, 3-4. Plaintiff alleges that he still experiences muscle spasms around his eye and aches on his head. See Doc. 1, p. 8.

Following an incident report, the case was forwarded to internal affairs for investigation. See Aff. Of June Bishop, Att. A (Doc. 161-4, p. 2). Plaintiff received a disciplinary report for the incident. Pl.'s Dep. 97, 8. Officer Hill did not press charges for injuries to his nose.[3] Pl.'s Dep. 97, 11-12.

## B. February 22, 2012

In his second claim, Plaintiff alleges that on February 22, 2012, Defendants Daniels,

---

[2] Plaintiff states in his deposition that the Officers should have intervened after the third "slam." Pl.'s Dep. 82, 21-25. Officer Hill slammed Plaintiff's head down because Plaintiff "got the best of him." Pl.'s Dep. 89, 20-21.

[3] The record reflects that Hill filed a Workers Compensation claim. See Aff. Of June Bishop, Att. A (Doc. 161-4, pp. 2, 14).

Walker, and Russo punched and kicked Plaintiff, who was "on the ground not resisting to be restrained." Doc. 1, p. 8. Plaintiff further claims that Defendant Russo grabbed and twisted Plaintiff's genitals, struck Plaintiff in the head twice with handcuffs, and slammed Plaintiff's head into the ground. According to Plaintiff, Defendants Jackson, Wesley, Mabry, Walters, and Johnson were also present but made no attempt to intervene.

Two days before this incident, on February 20, 2012, Plaintiff had assaulted another inmate, Tremayne Watson,[4] while in the shower, with a razor that Officer Jackson had given Plaintiff. Pl.'s Dep. 99, 12-25. Watson allegedly received fifty-four (54) stitches on his right forearm following the assault. See *Watson v. Bishop, et. al.*, 5:12-CV-451-CAR-CHW, 2013 WL 1748617 at *3 (M.D. Ga. Mar. 28, 2013). Plaintiff then wrote a fellow inmate, Dexter Shaw, that Deputy Warden Bishop had asked Plaintiff to attack Watson, in consideration for a transfer out of SMU. *Id.*

Following the attack on Inmate Watson, Plaintiff was placed in a "strip cell." Pl.'s Dep. 99, 20-22. Initially Plaintiff was assigned to the strip cell for eight hours, per GDOC policy. Pl.'s Dep. 99, 20-22. The next day, Defendant Kyles told Plaintiff that he was to remain in the strip cell for a week. Pl.'s Dep. 100, 1. In retaliation, Plaintiff damaged the sprinkler in his cell, causing his cell to flood. Pl.'s Dep. 100, 4-5; 6-10.

Meanwhile, Inmate Shaw sent Plaintiff's letter to Inmate Watson, igniting "fear" in the SMU between the guards and the inmates. See Pl.'s Dep. 137, 7. Plaintiff explains: "[t]here was a whole bunch of fear going on" (Pl.'s Dep. 137, 7), "you had people throwing doo-doo and urine and blood and semen on officers, you know, like the concoction people make behind the doors,

---

[4] Watson brought suit alleging that various prison officials colluded with Plaintiff Gholston in the attack. See *Watson v. Bishop, et. al.*, 5:12-CV-451-CAR-CHW, 2013 WL 1748617 (M.D. Ga. Mar. 28, 2013). Gholston testified in the trial of that case. Watson himself was the subject of a failure to protect claim in a lawsuit by another SMU inmate who alleged that Watson brutally raped him during a riot in the SMU on February 29, 2012, seven days after the alleged incident in this case. See *Brooks v. Warden*, 800 F.3d 1295 (11th Cir. 2015).

and then somebody squirted it on the officers" (Pl.'s Dep. 136, 24-137, 2). Indeed, Plaintiff gives himself some credit for the misbehavior, stating that the inmates "were riding off [Plaintiff's] energy," from the assault on Watson and the letter alleging the conspiracy between Plaintiff and Bishop. Pl.'s Dep. 105, 1-2.

The following day, Defendant Wesley arrived to remove Plaintiff from his cell so that a maintenance team could fix his sprinkler head. Pl.'s Dep. 103, 8-10. The cell extraction was video recorded. Pl.'s Ex. 5, DVD, Video of Incident February 22, 2012 (Doc. 142-7) at 2:26.[5] Defendant Wesley asked Plaintiff to come to the door to cuff up for transfer to another cell. Pl.'s Dep. 103, 11-14. Plaintiff, seeing a video camera, presumed that Defendant Wesley was not actually coming to cuff him up, but was instead planning a forced extraction from his cell. Pl.'s Dep. 103, 23-24; Pl.'s Dep. 104, 3-6; Pl.'s Dep. 114, 6-7. Plaintiff answered "alright" to Wesley's request to come to the door to cuff up. Pl.'s Ex. 5, DVD, Video of Incident February 22, 2012 (Doc. 142-7) at 2:32. Defendant Wesley stated on camera that Plaintiff had refused to cuff up, and that a forceful extraction would be necessary. Pl.'s Ex. 5, DVD, Video of Incident February 22, 2012 (Doc. 142-7) at 2:40-2:58. Plaintiff's door was opened by the control room and Officer Daniels[6] entered and pinned Plaintiff to the ground. Pl.'s Dep. 104, 1-6; Pl.'s Ex. 5, DVD, Video of Incident February 22, 2012 (Doc. 142-7) at 3:07-3:22. Plaintiff states that Officer Daniels brought Plaintiff to the ground "mostly by himself." Pl.'s Dep. 123, 13-16.

Once on the ground, the officers repeatedly told Plaintiff to stop resisting. Pl.'s Ex. 5, DVD, Video of Incident February 22, 2012 (Doc. 142-7) at 3:22-3:30. However, one Defendant can be seen on the video vigorously punching something with his arm. *Id.* at 3:18-3:30. [7] Plaintiff

---

[5] The United States Supreme Court has recognized a "wrinkle" in cases where the record contains video evidence, holding that when facts are disputed, and video evidence is present, a court should "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007).

[6] Plaintiff testified that Officer Daniels was nicknamed "400," apparently a reference to Officer Daniels' weight. Plaintiff suggested that "six or seven of me could fit inside" of Officer Daniels. Pl.'s Dep. 124, 14-15.

[7] At some point, the camera focuses on the window, and then the wall, instead of the officers, obscuring what was

can be heard stating that he "is not resisting,"[8] while an officer yells "stop resisting" yet again. *Id.* at 3:43. A sharp arm punch or quick movement was executed by another officer, after which a sharp and quick yelp can be heard. *Id.* at 4:05-4:06. The camera again moves behind the door to obscure from view the remainder of the altercation. *Id.* at 4:11.

At his deposition, Plaintiff testified that Defendant Russo grabbed and twisted Plaintiff's genitals, struck Plaintiff in the head twice with handcuffs, and slammed Plaintiff's head into the ground. Pl.'s Dep. 127, 4-9. The camera returns to the view as Plaintiff is instructed to get up. *Id.* at 4:17. The video shows that the buttons on Plaintiff's jumpsuit surrounding the groin area are unbuttoned. *Id.* at 4:29-4:30. Plaintiff's face is not visible upon exit from his cell. *Id.* at 4:32-4:35.

Following the forcible removal, Plaintiff was escorted out of his cell into a small examination room. *Id.* at 4:35-6:19. Plaintiff sustained injuries in the form of a "busted" eye, swelling on top of his head, soreness, headaches, and a "busted lip." Pl.'s Dep. 140, 13-16. The use of force assessment noted swelling on the right side of Plaintiff's head and small abrasions on his face and eyebrows. Pl.'s Ex. 6 (Doc. 142-8, p. 4). The nurse "deferred" description of injuries to Plaintiff's genitalia. *Id.* As to the "subjective complaint" listed on the assessment, the nurse noted Plaintiff's claim that his injuries were caused by "Russo," who had previously injured Plaintiff. *Id.* Plaintiff received glasses after the incident, for the first time in his life, due to his eye injury. Pl.'s Dep. 140, 18-23.

Following the incident, a use of force report was prepared. Pl.'s Ex. 8 (Doc. 142-10, p. 2). Warden Humphrey initialed the report, and concluded that the situation was "handled appropriately," but turned it over to Internal Affairs per the Standard Operating Procedure. *Id.* The results of the Internal Affairs investigation are not in the record.

---

happening from view. 3:30.
[8] A use of force assessment executed by Defendant Russo describes Plaintiff as "biting my left knee" during the assault. Pl.'s Ex. 4, Doc. 142-6, p. 2.

**C. December 5, 2012**

In his third claim, Plaintiff alleges that on December 5, 2012, Defendants Kyles, Russo, Williams, and Means sprayed Plaintiff with riot gas and instructed Plaintiff to "cuff up" through a small opening in the door. Plaintiff alleges that three officers then opened Plaintiff's cell door, rushed in, and knocked Plaintiff to the ground, kicking and punching him while he was restrained by handcuffs. Plaintiff does not sue Defendant Means for excessive force, presumably because Defendant Means did not "kick and punch" Plaintiff while he was on the ground. Doc. 1, pp. 8-9. Plaintiff does, however, sue Defendant Means, along with Defendants Clupper and Wilkins, for failing to intervene to stop the beating.

The December 5, 2012, incident began when Plaintiff shattered the window of his cell, causing shards of glass to fly out of the window onto the hallway floor and on the floor of Plaintiff's cell. Pl.'s Ex. 11, DVD, Video of Incident December 5, 2012 (Doc. 142-13), Camera 1, Track 1, 0:15. Plaintiff complained that his dinner tray was continuously "half empty," and that the prison staff was "not feeding [SMU inmates] the regular" food. *Id.* at 1:34-1:39. Plaintiff claimed that everything on his tray was spoiled, or had been "poisoned,"[9] and that he was sure to get food poisoning if he continued to eat the food. *Id.* at 2:04; 24:53. Plaintiff was simply "tired of it." *Id.* at 1:41-1:43. Officer Kyles observed that Plaintiff broke out the window and refused to follow all instructions.[10] Bishop authorized a use of force to remove Plaintiff from his cell "to prevent him from doing further damage to state property." *Id.* at 4:30-4:37; 14:13-14:20; see also Pl.'s Ex. 10, Incident Report of December 5, 2012 (Doc. 142-12).

The cell extraction began with a short burst of "MK-9" chemical agent discharged into Plaintiff's cell through the tray flap. Pl.'s Ex. 11, DVD, Video of Incident December 5, 2012 (Doc.

---

[9] Plaintiff included a "spoiled food sample" in a previously filed Motion. Doc. 86, p. 2.
[10] Plaintiff later states that he did not refuse to cuff up. Pl.'s Ex. 11, DVD, Video of Incident December 5, 2012 (Doc. 142-13), Camera 1, Track 1, at 15:56.

142-13), Camera 1, Track 1 at 4:49-4:52; Pl.'s Ex. 9, Report of Investigation, (Doc. 142-11, p. 4). Plaintiff remained in the cell for approximately six to ten minutes. Compare Pl.'s Ex. 11, DVD, Video of Incident December 5, 2012 (Doc. 142-13), Camera 1, Track 1 at 4:49-10:48 (revealing approximately six minutes between the pepper spray and the physical extraction) and Pl.'s Ex. 9, Report of Investigation, (Doc. 142-11, p. 4) (finding that Plaintiff was left inside his cell approximately eight to ten minutes after being sprayed with chemical agent). This was the first time that MK-9 had been used during a cell extraction, and the chemical was "extremely strong." Pl.'s Ex. 9, Report of Investigation, (Doc. 142-11, p. 4).

What happened in the cell is unclear, as the video evidence does not focus exclusively on the officers' conduct, but provides close up views of the doors, windows, and walls of Plaintiff's cell. The video evidence shows that striking, punching and kicking motions were made towards Plaintiff during the cell extraction. *Id.* at 11:45-11:48. Once Plaintiff was extracted from his cell and placed in handcuffs, blood can be seen seeping through Plaintiff's white shorts and shirt. *Id.*

Following the extraction, Plaintiff was taken to medical. *Id.* at 12:03. During his examination, Plaintiff told Nurse Gore that he "had glass in his eye" and needed to "detox these chemicals" off of his body. *Id.* at 15:47-15:50. Plaintiff also told Gore that his scratches needed stiches, to which Gore responded: "no it does not." *Id.* at 16:45-16:48.

Less than two minutes later, the camera shifts to a view of Plaintiff's foot, as well as a foot in a small, white tennis shoe, apparently Gore's. *Id.* at 18:02. A small pool of blood can be seen on the floor below where Plaintiff was treated; Nurse Gore stands less than a foot from the blood. *Id.* at 18:02-18:21. A later view of the floor shows no blood on the floor. Compare *Id.* at 18:21 with 25:12. Nurse Gore tells Plaintiff "you have three superficial scratches"[11] and Plaintiff responds that he had "multiple glass cuts—not scratches—glass cuts; that you covered up with this paper"

---

[11] Nurse Gore later told an internal affairs investigator that Plaintiff "had four superficial scratches." Pl.'s Ex. 10 (Doc. 142-12, p. 3).

*Id.* at 20:16-20:23. The amount of blood evidenced on the floor appears to be inconsistent with the "superficial scratches" indicated in Nurse Gore's affidavit, as well as in her initial Use of Force Assessment and in her statements on the video.

During his escort back from the medical examination, Plaintiff became visibly agitated as Defendant Kyles repeatedly told Plaintiff that he would not be allowed to shower. *Id.* at 24:43-30:00.[12] After repeated requests, however, Plaintiff was finally allowed to take a shower, and the incident ends with Plaintiff being placed in a shower cell. *Id.* at 30:26-32:34.

Following the incident, Internal Affairs conducted an investigation. Pl.'s Ex. 9 (Doc. 142-11, pp. 1-7). The investigative summary found inconsistencies in the testimony of Defendants Williams, Kyles and Russo. *Id.* at 3-4. Specifically, the investigation revealed that: (1) Kyles denied striking Plaintiff, although video evidence confirmed that "striking motions [were] made by LT Kyles on [Inmate] Gholston;" (2) Russo testified that Plaintiff was coming out of his cell, although video evidence shows Plaintiff with his back to the door; (3) Williams denied kicking Plaintiff, although "the video shows Officer Williams making kicking/stomping motions in the direction of [Inmate] Gholston." *Id.* at 3.The investigation also found that while general testimony from SMU staff identified Plaintiff as a "violent inmate that has assaulted staff," Defendants were wearing no protection during the forcible removal of the "highly aggressive inmate." *Id.* at 4. The case was submitted to legal review for a determination. *Id.* at 5.

## III. PROCEDURAL HISTORY

Plaintiff filed his complaint on November 22, 2013, bringing claims arising out of the three incidents described above. Defendants moved in three separate motions to dismiss some or all of Plaintiff's claims against them.[13] Docs. 26, 56, 75. The Court adopted a Recommendation to grant

---

[12] Plaintiff requests a detox, but was not afforded one, instead, was told he could detox in the sink in his cell. Pl.'s Ex. 11, DVD, Video of Incident December 5, 2012 (Doc. 142-13), Camera 2, Track 1 at 23:30-23:36.

[13] Defendant Octavius Walker no longer worked at GDCP at the time of service (Doc. 17); he was served by the

Defendants' motions in part, such that Plaintiff's claims against Defendants Humphrey and Bishop in their official capacities for money damages were dismissed. Doc. 91, 99. Plaintiff's failure to intervene and supervisory liability claims against all Defendants were allowed to proceed. Doc. 91, 99. Defendants did not move to dismiss Plaintiff's excessive force claims against Defendants Kyles, Daniels, Walker, Russo, and Williams, which Plaintiff sufficiently alleged in his complaint.

While the Recommendation was pending, Plaintiff filed a Motion to Amend, alleging additional facts not contained in his complaint. Docs. 94, 96. Specifically, Plaintiff sought to (1) clarify the amount of damages he sought, and (2) add a new Defendant: Superintendent Rodney McCloud. Doc. 96, p. 1. Plaintiff's Motion was granted as to the amount of damages he sought but was denied as to Rodney McCloud, as Plaintiff's claims against him were better suited for a separate cause of action. See Doc. 103.

Discovery commenced on March 23, 2015. Doc. 105. After two motions to compel (Docs. 113; 115) and numerous extensions of time (Docs. 120; 121; 130; 131; 135; 143; 146; 153; 155; 157), both Plaintiff and Defendants filed their Motions for Summary Judgment. (Docs. 142; 161; 162). Both parties have responded and the motions are ripe for review.

## IV. DISCUSSION

From the facts set out above, Plaintiff presents the following claims arising out of the Eighth Amendment before the Court:

1. Excessive Force Claim against Defendants Kyles, Daniels, Walker, Russo, and Williams.

2. Failure to Intervene Claim against Defendants O'Neal, Cooper, Kyles, Jackson, Wesley, Mabry, Johnson, Walters, Clubber, Wilkins, McMillian, and Means.

3. Failure to Protect claims against Defendants Humphrey and Bishop.

Plaintiff argues that he is entitled to summary judgment on all of the above stated claims. Doc.

---

United States Marshals Service on July 20, 2015 (Doc. 127), and filed a separate Answer on August 10, 2015 (Doc. 129). He filed a separate Motion for Summary Judgment on February 4, 2016. (Doc. 162.)

142-1. In their motion for summary judgment, the respective Defendants argue that: (1) they cannot be held liable for their failure to intervene (Doc. 161-2, pp. 8-10): (2) the record fails to support a supervisory liability claim (Doc. 161-2, pp. 10-11); (3) they enjoy qualified immunity from suit (Doc. 161-2, pp. 12-13); (4) the PLRA bars relief on some of Plaintiff's claims (Doc. 161-2, pp. 13-15); and (5) Plaintiff is not entitled to injunctive relief (Doc. 161-2, pp. 15-16).

Defendants do not move for summary judgment on Plaintiff's excessive force claims.

## A.  Civil Actions under 42 U.S.C. § 1983

Plaintiff brings his action under Section 1983 of Title 42 of the United States Code, which provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The statute creates no protected rights, but instead provides a remedy for a violation of constitutional rights committed under color of state law. There is no debate that Defendants were acting under color of state law during all the events pertinent to this case. Thus, the issue under consideration is whether Defendants violated Plaintiff's constitutional rights. Even assuming, however, that Defendants violated Plaintiff's constitutional rights, Defendants may still enjoy the protection of qualified immunity against claims brought against them in their individual capacity. "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Courts employ a two-part framework to evaluate qualified immunity claims.[14]  In order to deprive a defendant of qualified immunity, a plaintiff must demonstrate both that a constitutional violation occurred and that the constitutional right violated was clearly established.[15]  *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The court may analyze those two questions in whatever order is most appropriate in the case before it. *Pearson v. Callahan*, 555 U.S. 223 (2009).

<u>Plaintiff's Motion for Summary Judgment</u>

### B.  Excessive Force

As stated above, only Plaintiff has moved for summary judgment on the excessive force claim. Thus, in this section only, the facts will be construed in the light most favorable to the Defendants. Plaintiff's excessive force claims against the Defendants implicate the Eighth Amendment: "the treatment a prisoner receives in prison ... [is] subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (citation omitted). An Eighth Amendment violation is cognizable under 42 U.S.C. § 1983. *Hale v. Tallapoosa Cnty.,* 50 F.3d 1579, 1582 (11th Cir. 1995). "The eighth amendment prohibition against cruel and unusual punishment is triggered when a prisoner is subjected to a[n] 'unnecessary and wanton infliction of pain.'" *Bennett v. Parker,* 898 F.2d 1530, 1532 (11th Cir. 1990).

To establish a claim for excessive force, the Plaintiff must show that: (1) the Defendants acted with a malicious and sadistic purpose to inflict harm; and (2) more than *de minimis* injury resulted. *Johnson,* 280 F.3d at 1321 (11th Cir. 2002). The Supreme Court has clarified "[t]he 'core judicial inquiry' ... [is] not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or *maliciously and*

---

[14]  There is an often overlooked requirement that precedes that two-part inquiry: whether Defendant was acting within the scope of his discretionary authority. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). Here, it is clear that the officers were operating within the scope of their discretionary authority during the incident.
[15]  At the summary judgment phase, the Court answers these two questions taking the facts in the light most favorable to the plaintiff.

*sadistically* to cause harm.'" *Wilkins v. Gaddy,* 559 U.S. 34, 37 (2010) (quoting *Hudson v. McMillian,* 503 U.S. 1, 7 (1992)) (emphasis added).[16]

Although the extent of any injury is not alone dispositive of an excessive force case, it is "one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." *Hudson,* 503 U.S. at 7 (*quoting Whitley v. Albers,* 475 U.S. 312, 321 (1986)). Not "every malevolent touch by a prison guard" or "every push or shove" violates a prisoner's constitutional rights, and the "prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. 9–10 (1992) (citations omitted). Although injuries need not be severe to support an excessive force claim, the failure to show any injury may indicate that the force was not so excessive as to violate the prohibition against an unnecessary and wanton infliction of pain. *Id.* at 10.

In determining whether the force was applied "maliciously and sadistically to cause harm," the Court considers several objective factors, including: a) the need for the application of force; b) the relationship between the need and the amount of force that was used; c) the extent of the injury inflicted upon the prisoner; d) the extent of the threat to the safety of staff and inmates; and e) any efforts made to temper the severity of a forceful response. *Whitley*, 475 U.S. at 321; *Hudson*, 503 U.S. at 7. Courts are to "give a wide range of deference to prison officials acting to preserve discipline and security." *Id.*

---

[16] It is worth noting that in 2015, the Supreme Court clarified the standard to be used in excessive force claims brought by pretrial detainees, holding that it does not have a subjective element. See *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015). Although the Eleventh Circuit has yet to apply *Kingsley*, the Supreme Court and lower courts recognize that "*Kingsley* did not overrule cases applying a different, subjective [*Whitley*] standard to Eighth Amendment excessive force claims by convicted prisoners." *Davis v. White*, 794 F.3d 1008, 1012 n.1 (8th Cir. 2015) (citing *Kinglsey*, 135 S. Ct.. at 2476 and *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)); *Odom v. Jasper Cty.*, No. 5:14-CV-22 (CAR), 2016 WL 1254358, at *9-10 (M.D. Ga. Mar. 29, 2016) (noting that *Kingsley* applies to claims bought by pre-trial detainees, while *Whitley* applies to claims brought by prisoners).

The determination "must not be made in the glow of hindsight." *Griffin v. Troy State Univ.*, 128 Fed. App'x. 739, 742 (11th Cir. 2005) (citation omitted). Instead, the relevant inquiry is whether the decision by the government official was egregious, that is, conscience-shocking, at the time the official made the decision. *Id.* "Unless it appears that the evidence, viewed in the light most favorable to the [defendant], will [not] support a reliable inference of wantonness in the infliction of pain ... the case should not go to the jury." *Whitley*, 475 U.S. at 322. Additionally, under Eleventh Circuit law, in cases in which a collective use of force is alleged, the court need not analyze separately the force administered by each officer to determine which of the blows or other acts, if any, constituted the use of excessive force. *Skrtich*, 280 F.3d. at 1302.

The evidence before the Court raises genuine issues of material fact as to whether the Defendants acted with a malicious and sadistic purpose to inflict harm and that a more than *de minimis* injury resulted. Thus, Plaintiff's Motion for Summary Judgment on his excessive force claim cannot be granted. Each factor is analyzed separately below.

### 1. The Need for Force

The evidence for each instance shows that the Defendants had a legitimate need for force, as Plaintiff refused to follow orders and created a disturbance. The Eleventh Circuit makes clear that "[p]rison guards may use force when necessary to restore order." *Bennett,* 898 F.2d at 1533. The court further notes that "prison guards do not have the luxury or obligation to convince every inmate that their orders are reasonable and well-thought out. Certainly they are not required to do so where an inmate repeatedly fails to follow those orders." *Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008). The need for the use of force, the first factor to be considered in the excessive force analysis, is established "by the undisputed evidence that [the inmate] created a disturbance." *Bennett*, 898 F.2d at 1533.

As to the February 3, 2012 incident, Plaintiff's own testimony establishes a genuine issue of material fact as to the need for force. Plaintiff testified that he slipped out of his handcuffs with a concealed razor and punched Officer Hill in the nose with his free handcuff. Pl.'s Dep. 55, 14-21; Pl.'s Dep. 62, 15-16; Pl.'s Dep. 97, 1-4. Plaintiff's actions were a violation of normal prison protocol, and constituted a direct attempt by Plaintiff to assert authority over Officer Hill. See *Helton v. Burks*, No. 1:11-CV-77 WLS, 2013 WL 6081764, at *4 (M.D. Ga. Nov. 19, 2013) (citing *Soto v. Dickey,* 744 F.2d 1260, 1267 (7th Cir. 1984) ("When an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.")). Thus, the evidence is insufficient to show, as a matter of law, that the use of force was unnecessary.

As to the use of force on December 5, 2012, as well, there are genuine issues of material fact as to the necessity of force. Indeed, video evidence proffered by the Plaintiff opens with Plaintiff violently and forcefully using his tray to break his cell door window. See Pl.'s Ex. 11, DVD, Video of Incident December 5, 2012, Camera 1, Track 1, 0:00-0:15. Officer Kyles recognized that Plaintiff broke out the window and refused to follow "all" instructions, including ceasing to break his cell window; and that Bishop authorized a use of force (*Id.* at 4:30-4:37), "[t]o prevent him from doing further damage to state property" (*Id.* at 14:13-14:20). Although Plaintiff states that he did not refuse to be handcuffed (*Id.* at 15:56), his testimony does not eliminate genuine issues as to whether some force was necessary. Even if Plaintiff had complied with Kyle's order to be handcuffed, Plaintiff's previous behavior, coupled with the deliberation and intensity of the breaking of the window, showed a need for force.

Finally, as to the incident on February 22, 2012, however, the record shows a genuine issue of material fact as to the need for force. Plaintiff testified that Defendant Wesley told Plaintiff workers were coming to fix the sprinkler head and asked Plaintiff to come to the door to be

handcuffed. When Plaintiff saw a video camera, he presumed that the officers were not actually intending to cuff him. Pl.'s Dep. 103, 23-24. Plaintiff states that he never refused to cuff up. Pl.'s Dep. 112, 4. Instead, Wesley stated on camera that Plaintiff refused to cuff up, and Officer Daniels entered the cell and pinned Plaintiff to the ground. Pl.'s Dep. 103, 23-24; Pl.'s Dep. 104, 3-6; Pl.'s Dep. 114, 6-7. Plaintiff's testimony, along with the video evidence, shows genuine issues of material fact as to whether Plaintiff was hostile or otherwise noncompliant at that time of the cell extraction. The video is blurry and at times very difficult to view or hear. It appears that Plaintiff answered "all right" when asked to come to the cell door to be handcuffed. Pl.'s Ex. 5, DVD, Video of Incident February 22, 2012 (Doc. 142-7) at 2:32. Given the conflicting accounts of the event, and some evidence that Plaintiff was compliant, a determination as to this factor cannot be made until the issue of fact is resolved.

2.   *The Relationship Between the Need for Force and the Amount of Force Used*

To determine the reasonableness of force used for each incident, the Court may look to a variety of considerations, including Plaintiff's reputation, Plaintiff's mood, and the likelihood of physical confrontation. Plaintiff's reputation in the SMU—as described in his own deposition—shows that Plaintiff had a consistent history of refusing to comply with officers' orders and that officers had often been required to use force against him to subdue him since his arrival at SMU in 2011. See *Skrtich*, 280 F.3d at 1301 n. 7 ("An officer's knowledge of [past confrontations] may be relevant to the assessment of the degree of force that a reasonable officer would have believed was necessary."). Plaintiff describes himself as agitated and hostile, and states that he has struggled with anger problems since a young age.[17] Cf. *Draper v. Reynolds*, 369

---

[17] For example, Plaintiff describes his violent tendencies and behavior in the following testimony:

> I get very violent, you know, if I feel that I have been violated, I been doing things the right way, if I feel I'm not getting listened to or nothing being done, I feel like they are doing it on purpose, I am going to do something about. If I feel like I'm being bullied or somebody is trying to take something from me, then I'm going to do something about it, no matter how many people it is or what.

F.3d 1270, 1278 (11th Cir. 2004) (holding, in context of Fourth Amendment excessive force claim, that it was not unreasonable for an officer to Taser an individual who was "hostile, belligerent, and uncooperative" and had "repeatedly refused to comply with [the officer's] verbal commands" while "us[ing] profanity, mov[ing] around and pac [ing] in agitation, and repeatedly yell[ing] at" the officer).[18] Further, the use of pepper spray is a reasonable means of attempting to enforce compliance without precipitating a dangerous physical confrontation.[19]

Evidence from the February 3, 2012 incident, viewed in the light most favorable to Defendants, does not conclusively show that the force used was out of proportion with the need for force.[20] On that day, Plaintiff was hostile and belligerent, was in possession of a razor blade, and was able to escape from his handcuffs and use those handcuffs to punch Officer Hill in the nose. In light of Plaintiff's history as a violent and difficult inmate, as well as the significant safety threat of an unrestrained inmate assaulting prison guards, a reasonable finder of fact could determine that

---

Sometimes I let it go, sometime I won't. But if a person keeps on pushing me over, pushing me over, and I keep letting it go, then I'm going to let them know, no, you are not going to keep doing it no more. I get very, very violent, and that' s been my coping skills to keep people off me - - excuse my language - - keep people off my ass. Especially in prison, if you are an individual that' s known to be weak or a coward, let people run over you, whether it be an inmate or officer, they are going to keep doing it. And I done learned sometimes it takes violence to let people know you are not going to be pushed over. But lately within the last year or so, I have been able to manage my anger as far as not putting my hands on people. When I get mad, I just get to cursing, cussing and screaming loud or arguing with people, because I feel like I'd rather do that before I do some things that I know I am capable of, and I don't want to do those things no more.

Pl.'s Dep. 37-38.

[18] "The standard for showing excessive force in violation of the [Eighth] Amendment ... is higher than that required to show excessive force in violation of the Fourth Amendment." *Fennell*, 559 F.3d at 1217.

[19] As a matter of law, "[a] short burst of pepper spray is not disproportionate to the need to control an inmate who has failed to obey a jailer's orders."*Danley*, 540 F.3d at 1307, (*citing Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002) ("Courts have consistently concluded that using pepper spray is reasonable ... where the plaintiff was ... refusing police requests.")).

[20] Compare *Johnson v. Moody*, 206 F. App'x 880, 882-84 (11th Cir. 2006) (Holding that the "[Guard']s kicking of the tray door with his foot … resulting in a minor injury" was proportional to inmate's refusal to remove arm from the tray flap, and recognizing that "…although [the Guard] arguably could have waited to see whether [plaintiff] would remove his hand from the tray door completely, [plaintiff] failed to produce evidence showing that this action was taken 'maliciously and sadistically for the very purpose of causing harm.'") with *Skrtich v. Thornton*, 280 F.3d 1295, 1302 (11th Cir. 2002) (determining that guards collective beatings resulting in "multiple rib fractures, back injuries, lacerations to the scalp, and abdominal injuries requiring hospitalization for nine days and rehabilitation for months" was not proportional to guards' order to submit to handcuffing.).

the use of force against Plaintiff was not unreasonable. And as the Eleventh Circuit has recognized: "the management by a few guards of large numbers of prisoners, not usually the most gentle and tractable of men and women, may require and justify the occasional use of a degree of intentional force." *Bennett v. Parker*, 898 F .2d 1530, 1533 (11th Cir. 1990).

Genuine issues of material fact also exist as to the incidents on February 22, 2012 and December 5, 2012. As noted above, there are issues of fact regarding Plaintiff's compliance with commands on February 22, 2012. If in fact Plaintiff did not refuse commands to allow himself to be handcuffed, the need for force would have been minimal, and the amount of force used would have been disproportionate. In the alternative, if Plaintiff was noncompliant and hostile, a greater use of force may have been merited. Further, the extent of Plaintiff's injuries from February 22, 2012, specifically the injury to his genitals is in dispute. Similarly, as discussed in the third *Whitley* factor, while Plaintiff's behavior on December 5, 2012, merited the use of some force, genuine issues of material fact exist as to the extent of Plaintiff's injuries.

### 3.   The Extent of the Resulting Injury

The third *Whitley* factor—the extent of Plaintiff's injury from the incident—presents additional conflicts in evidence, and warrants further investigation at trial. Although the "nature of the force rather than the extent of the injury" is the relevant inquiry in Eighth Amendment excessive force cases, the extent of injury is still a "factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation." *Wilkins*, 559 U.S. 34, 34-36 (2010) (internal quotations and citation omitted). In most excessive force cases, the extent of injury caused by the alleged excessive force is apparent. See *Skrtich*, 280 F.3d at 1302, supra (prisoner suffered multiple rib fractures, back injuries, lacerations to the scalp, and abdominal injuries as a result of beating at the hands of prison officials).

Plaintiff testifies that on February 3, 2012, he sustained injuries to his head and above his

eye after Officer Hill slammed his head into the floor five times, punched him in the head three times, and spit on him. Pl.'s Dep. 60, 21-23. The injuries that resulted are largely undisputed. As noted in the use of force assessment, Plaintiff sustained a six centimeter laceration on his eyebrow. See Pl.'s Ex. 2, Use of Force Assessment, Doc. 142-4, p. 4; Pl.'s Ex. 3, Use of Force Supplement Report, Doc. 142-5, p. 2. The injury required sixteen stitches, sutured the next day by medical staff. Pl.'s Dep. 80, 4-5. Photos of Plaintiff following the injury also reveal a deep gash in his nose. Aff. Of June Bishop, Att. A (Doc. 161-4, pp. 8, 12). Plaintiff still complains of involuntary twitching related to this incident. These injuries are consistent with the level of force alleged by Plaintiff.

On February 22, 2012, Plaintiff contends that he sustained lacerations to his eye and lip, swelling on top of his head, soreness, and headaches. Pl.'s Dep. 140, 13-16. A subsequent medical assessment revealed somewhat consistent findings: a small abrasion above his left eye and swelling on right side of his head. Dec. of Mary Gore, Doc. 161-7, pp. 4-5. No other injuries were noted. No follow-up was needed. *Id.* Although Plaintiff does not specifically challenge the use of force assessment, genuine issues of fact exist as to the extent of Plaintiff's injuries on February 22, 2012. For example, in his deposition, Plaintiff claims that Defendant Russo grabbed and twisted Plaintiff's genitals, struck Plaintiff in the head twice with handcuffs, and slammed Plaintiff's head into the ground. Pl.'s Dep. 127, 4-9. Review of the video evidence shows that Plaintiff told officials during his examination that "one of his balls is broke" and that Plaintiff's jumpsuit was unbuttoned in his groin area after the officers lifted him up from the floor. Pl.'s Ex. 5, DVD, Video of Incident February 22, 2012 (Doc. 142-7) at 7:48-7:50 (comment) and 4:29-4:30 (view of Plaintiff being pulled up by Defendants). The use of force assessment does not describe any genital injury, but suggests that Nurse Forrest "deferred" examination of Plaintiff's genitals.

As to the December 5, 2012 incident, Plaintiff alleges he sustained injuries to his face, legs, and back. See Doc. 142-2. The use of force assessment prepared by Nurse Gore indicated that Plaintiff had four superficial scratches to his left knee/leg, and one superficial scratch on his right knee. Dec. of Mary Gore, Doc. 161-7, p. 4. She observed no other injuries, and indicated that no follow-up was needed. *Id.* at 5. Her report is not consistent with the video evidence, however. Although the camera is faced towards the ground for a majority of the examination, the conversation is still audible. The video reveals that when Plaintiff entered medical, Plaintiff told Gore that his scratches need stiches. Pl.'s Ex. 11, DVD, Video of Incident December 5, 2012 (Doc. 142-13), Camera 1, Track 1 at 16:45-16:48. Gore told Plaintiff "no it does not." *Id.* at 16:48. Less than two minutes later, the camera briefly shifts to a view of Plaintiff's foot, as well as a foot in a small, white tennis shoe, that is apparently Gore's. *Id.* at 18:02. A small pool of blood can be seen on the floor below where Plaintiff was treated. *Id.* at 18:02-18:21. It is unclear whether the blood is dry or fresh, but a later view of the floor shows no blood on the floor. Compare *id.* at 18:21 with 25:12. Nurse Gore can be heard telling Plaintiff, "You have three superficial scratches." 20:16. Plaintiff replies that he had "multiple glass cuts—not scratches—glass cuts; that you covered up with this paper" 20:16-20:23. The amount of blood evidenced on the floor is inconsistent with the "superficial scratches" described in Nurse Gore's affidavit as well as her initial Use of Force Assessment and her statements on the video, and raises credibility issues as to Nurse Gore's testimony, creating a genuine issue of material fact as to the extent of Plaintiff's injuries.

Plaintiff does not appear to have suffered any injuries from the pepper-spray,[21] and Plaintiff would have difficulty showing an injury as a matter of law, as the Eleventh Circuit has held that "[a]ny injuries or discomfort . . . suffered as a necessary result of a dose of pepper spray [are] neither substantial nor long lasting", as pepper spray "is designed to disable a suspect without

---

[21] Plaintiff stated in the video recording of the incident that he had been sprayed with pepper-spray "over one-hundred times." See Pl.'s Ex. 11, DVD, Video of Incident December 5, 2012 (Doc. 142-13), Camera 1, Track 1 at 32:10-32:12.

causing permanent physical injury." *Danley*, 540 F.3d at 1308. The findings of the GDOC's internal investigator reveal that this was the first time that the particular pepper spray, MK-9, had been used during a cell extraction, and that the chemical was "extremely strong." Pl.'s Ex. 9, Report of Investigation, (Doc. 142-11, p. 4). While the injury may not have been substantial as a matter of law, these facts are important in consideration of the fifth *Whitley* factor—as described more fully in Section 5, below.

### 4. The Extent of the Threat to the Safety of Staff and Inmates

The fourth factor requires an assessment of "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible official on the basis of facts known to them." *Whitley*, 475 U.S. at 321. An inmate's refusal to comply with orders creates a threat to the safety of staff and inmates. *See, e.g., Danley,* 540 F.3d at 1308; *McClendon v. Smith,* at 2014 WL 575538 *6 (M.D.Ga. 2014). Nevertheless, "officers cannot continue the use of force once the threat has passed or the prisoner is subdued." *Skritch*, 280 F.3d at 1303; *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999).

As discussed in the Court's analysis of the first factor, Plaintiff's refusal to obey orders and established prison rules, on February 3, 2012, and on December 5, 2012, created a disturbance that necessitated some use of force. Plaintiff's refusal to follow orders posed a threat to the safety of staff and inmates in several ways. In both events, at least four officers' attention was diverted from maintaining security throughout the facility to the task of forcing Plaintiff to comply with orders. A single inmate's refusal to follow orders threatens to undermine officers' authority throughout a facility, and an inmate's non-violent protestations can easily escalate to physical resistance (and officers are not required to wait for this escalation before using physical force). See *Brown v. Smith*, 813 F.2d 1187, 1189–90 (11th Cir. 1987) (judgment in favor of an officer who used force against an inmate to accomplish the "legitimate security purpose" of getting the inmate into his

cell.).

Yet another consideration in this factor is Plaintiff's history as a violent inmate and the circumstances surrounding the event, as reasonably perceived by the officer. On February 3, Plaintiff presented with a razor blade, broke out of his handcuffs, and assaulted an officer by using his handcuffs as a weapon. Given that Plaintiff had a known history of violent and dangerous behavior, and that Plaintiff was unrestrained, outside of his cell, and assaulting an officer, a reasonable officer could have perceived the threat to the safety and security of the prison to be high.

On February 22, both the events leading up to the cell extraction and Plaintiff's history indicated a significant threat to the health and safety of prison staff and fellow inmates as reasonably determined by the officers. Plaintiff credited himself for creating a riotous environment in the SMU during February of 2012, having recently assaulted inmate Watson in the shower and having spread a story that the deputy warden ordered the assault. Further, Plaintiff had assaulted Officer Hill just twenty (20) days prior. Based on this evidence, a reasonable finder of fact could determine that the extent of the threat to the safety of staff and inmates was high.

Similarly, as to the December 5 incident, there is sufficient evidence to support a finding that Plaintiff once again posed a significant threat to the safety of staff and inmates when he shattered the window in his cell door while shouting and protesting about the quality of his food. This action, in light of Plaintiff's aggressive behavior and history of violence, raised a reasonable concern about the possibility of escalation. Based on this evidence, a reasonable finder of fact could determine that Plaintiff's actions warranted a substantial use of force.

### 5. *Efforts to Temper the Severity of a Forceful Response*

Finally, the Court considers efforts made by the officer to temper the severity of the force used against Plaintiff. The record shows that Plaintiff was seen the day of each incident for full use

of force medical examinations. Efforts to temper the severity of a forceful response can include: ceasing the use of force once a inmate has been subdued, *Danley,* 540 F.3d at 1308–09; checking on the inmate's wellbeing throughout the application of force, *Stanfill v. Talton,* 851 F.Supp.2d 1346, 1373 (M.D.Ga. 2002) (holding that checking on a prisoner every fifteen minutes while he was in a restraint chair constituted an effort to temper the severity of a forceful response); and summoning medical assistance. *Cockrell v. Sparks,* 510 F.3d 1307, 1312 (11th Cir. 2007) ("[T]he fact that [the officers] immediately summoned medical assistance for [Plaintiff], 'temper[ed] the severity of [the] forceful response,' and makes it less likely that either of them was acting sadistically instead of in good faith." (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)). Although Plaintiff was seen by medical staff after each incident, genuine issues of fact remain as to whether the Defendants ceased the use of force once Plaintiff was "subdued." Indeed, Plaintiff's description of the events on February 3 present facts suggesting that Officer Hill continued to use force by slamming Plaintiff's head against the floor five times, after he was restrained.

During the February 22 and December 5 events, the guards can be heard saying "stop resisting" while they continued to restrain Plaintiff on the floor. Pl.'s Ex. 5, DVD, Video of Incident February 22, 2012 (Doc. 142-7) at 3:22-3:30; Pl.'s Ex. 11, DVD, Video of Incident December 5, 2012 (Doc. 142-13) Camera 1, Track 1 at 11:10-11:15 (officer can be heard saying "stop fucking moving").[22] This suggests that the Defendants ceased the use of force once Plaintiff was subdued. On February 22, Plaintiff responded to the guards' comments: "I'm not resisting," a fact he later emphasizes during his medical examination. *Id.* at 3:40-3:43; 14:00-14:05 ("Russo slammed my head against the floor while I was in handcuffs.").

As to the December 5 use of force, video evidence shows that Plaintiff was allowed to detox in the shower after his cell was sprayed with chemical agent, although Plaintiff had to

---

[22] Evidence from the second camera shows distinct kicks and punches around the same time as the officer's comment. See Pl.'s Ex. 11, DVD, Video of Incident December 5, 2012 (Doc. 142-13) Camera 2, Track 1 at 5:40-5:50.

request the opportunity to shower multiple times. Pl.'s Ex. 11, DVD, Video of Incident December 5, 2012 (Doc. 142-13) Camera 1, Track 1 at 18:32-18:38 (request); 19:00-19:05 (request); 30:26-32:34 (permission granted and escort to shower cell). The internal investigator noted that Plaintiff was left in his cell for approximately ten minutes after the chemical agent was discharged.[23] Although the investigator also noted that the agent was stronger than had ever been used before, and that several officers were unable to cope with the spray without a gas mask, Nurse Gore never treated Plaintiff for pepper-spray. Compare Pl.'s Ex. 9, Report of Investigation, (Doc. 142-11, p. 4) with Dec. of Mary Gore, Doc. 161-7, pp. 4-5.

Considering all the factors, there are genuine issues of material fact that preclude the entry of summary judgment in favor of Plaintiff. As to the February 3, 2012 incident, Plaintiff has not shown as a matter of law that the need for force was unwarranted or that a serious threat of safety to the staff and inmates of the SMU was absent. Additionally, issues of fact exist as to whether the amount of force used was proportional and whether the Defendants tempered the severity of the force. As to the February 22, 2012 incident, genuine issues of material fact exist as to the need for force, the extent of the injuries, and whether Defendants tempered the severity of their response. Finally, as to the December 5, 2012 incident, genuine issues of material fact exist as to the extent of the injuries Plaintiff sustained from the glass on the floor and whether the Defendants properly tempered the severity of their response. Accordingly, Plaintiff's Motion for Summary Judgment must be denied as to his excessive force claim.

<u>Defendants' and Plaintiff's Motions for Summary Judgment</u>

## C. Failure to Intervene

Both Plaintiff and Defendants have moved for summary judgment on Plaintiff's Failure to

---

[23] Compare Pl.'s Ex. 11, DVD, Video of Incident December 5, 2012 (Doc. 142-13), Camera 1, Track 1 at 4:49-10:48 (revealing approximately six minutes between the pepper spray and the physical extraction) and Pl.'s Ex. 9, Report of Investigation, (Doc. 142-11, p. 4) (finding that Plaintiff was left inside his cell approximately eight to ten minutes after being sprayed with chemical agent).

Intervene claims. In their motion, Defendants argue that (1) their actions do not support a claim for failure to intervene; and (2) qualified immunity protects them from suit. See Doc. Doc. 161-2, pp. 8-10, 12-13. The two arguments are related, as a finding of qualified immunity also requires a finding that Defendants did not violate Plaintiff's rights under the Eighth Amendment.

It is clearly established precedent in the Eleventh Circuit that correctional officers may be held liable under Section 1983 when a constitutional violation occurs in their presence and they fail to take reasonable measures to prevent or end it. *Williams v. Scott*, 433 Fed. App'x 801, 805 (11th Cir. 2011) ("Prison correctional officers may be held directly liable under § 1983 if they fail or refuse to intervene when a constitutional violation occurs in their presence" (citing *Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998))); *see also Skrtich v. Thornton*, 280 F.3d 1295, 1302 (11th Cir. 2002) ("'[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for nonfeasance.'" (quoting *Fundiller v. Cooper City*, 777 F.2d 1436, 1441-42 (11th Cir. 1985))). Thus, the second prong of qualified immunity is met as clearly established law gave these Defendants fair warning that their failure to intervene while in the presence of other officers using excessive force against the Plaintiff violated the Plaintiff's Eighth Amendment rights.

Instead, the focus of inquiry at this stage of the case is whether or not the Defendants violated Plaintiff's constitutional rights under the Eighth Amendment—the first prong of the qualified immunity analysis. A constitutional violation arises only when, during an excessive use of force, the officer is in a position to intervene, but fails to do so. See *Ensley*, 142 F.3d at 1407 ("[F]or an officer to be liable for failing to stop [officer] brutality, the officer must be in a position to intervene[.]"); *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 925 (11th Cir. 2000) (recognizing that "[t]wo minutes was long enough for a reasonable jury to conclude that [officer] had time to intervene."). If there is no underlying use of excessive force, another officer has no

obligation to intervene. *Crenshaw v. Lister*, 556 F.3d 1283, 1294 (11th Cir. 2009) (holding that where officer's use of force is not excessive, other officer who was present at the scene had no obligation to intervene). As applied to this case, Defendants would be entitled to judgment as a matter of law if they could show that Plaintiff failed to present substantial evidence that would allow a reasonable jury to find that any Defendant had the opportunity to intervene in an excessive use of force and failed to do so.

Summary judgment is not proper on Plaintiff's failure to intervene claims because neither the Plaintiff nor the Defendants have established as a matter of law that the force used on Plaintiff during all three incidents was or was not excessive. Accordingly, the Court cannot grant either Plaintiff's or Defendants' Motions as to the failure to intervene claims.

### D.  Supervisory Liability of Defendants Bishop and Humphrey

Finally, Plaintiff argues that Defendants Bishop and Humphrey should be held liable in their individual capacities under the theory of supervisory liability for alleged constitutional violations by Defendants Hill, Daniels, Walker, Russo, Kyles, and Williams during their use of force. Plaintiff states "both even tried to cover up the incidents (abuses) with lies." Doc. 142-1, p. 4. In response, both Defendants argue that Plaintiff fails to state a claim for supervisory liability and that they are entitled to qualified immunity. Because there is no evidence, sufficient to create a genuine issue of material fact, to show that Bishop or Humphrey personally participated in or caused the alleged constitutional violations, Bishop and Humphrey are entitled to judgment as a matter of law.

#### 1.  Supervisor Liability under Section 1983

"It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (quoting *Hartley v. Parnell*, 193

F.3d 1263, 1269 (11th Cir. 1999)). Rather, "supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Id*. The necessary causal connection can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (quoting *Braddy v. Fla. Dept. of Labor & Employment*, 133 F.3d 797, 802 (11th Cir. 1998)); *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). Alternatively, the causal connection may be established when a supervisor's "'custom or policy ... result[s] in deliberate indifference to constitutional rights'" or when facts support "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Gonzalez*, 325 F.3d at 1234 (quoting *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir.1991)); "The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." *Gonzalez*, 325 F.3d at 1234 (internal quotation marks and citation omitted).

As the Defendants' argue that they are entitled to qualified immunity, this recommendation evaluates whether the Plaintiff has demonstrated both that a constitutional violation occurred and that the constitutional right violated was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

### 2. *Constitutional Violation*

There is insufficient evidence in the record to indicate that Deputy Warden Bishop was personally involved in the excessive use of force; or that either Bishop or Warden Humphrey were causally connected to the incidents. Plaintiff states that he believes Bishop personally ordered the

guards down to his cell on February 22, but "cannot say for sure." Plaintiff attributes the February 22, use of force, in part, to the "fear" and general chaos in the SMU at the time, but provides no evidence that Bishop was aware of that fear or that she sent the guards to Plaintiff's cell to "use him as an example." Instead, Bishop's testimony through her affidavit affirms that although she was aware that Plaintiff had to be forcibly removed from his cell on February 22, 2012, she did not instruct her officers to use excessive force or harm him. Doc. 161-3, p. 3. She was also not told at the time that the conduct of any officer involved was inappropriate. *Id.*

There is no evidence that any command or policy of Bishop or Humphrey led to the excessive use of force alleged by Plaintiff. In each of the three use of force incidents described above, the evidence shows that there was a clear need for some use of force. The evidence raises questions of fact only as to whether the officers participating in the uses of force may have exceeded the force required. In no case does it suggest that no force whatsoever was authorized.

As to the February 3, 2012, incident, Plaintiff concedes that he was in possession of a razor blade, freed himself from handcuffs, and used the handcuffs as a weapon to assault Officer Hill. Plaintiff was known to be a dangerous inmate with a lengthy history of violent behavior. Although this situation plainly required a use of force, Plaintiff contends that Officer Hill continued to beat Plaintiff's head on the floor after Plaintiff was subdued. The February 3 use of force was an immediate response to inmate violence. There is no evidence that either Bishop or Humphrey instructed Hill to use force or had any involvement in the incident.

As to the February 22, 2012, incident, there is some indication that Bishop had prior knowledge of the need for a cell extraction and may have authorized a use of force. Plaintiff had assaulted and severely injured another inmate with a razor blade, had created a general disturbance in the facility, and had intentionally damaged the sprinkler head in his cell. Based on these facts, a forcible cell extraction was warranted, but Plaintiff contends that the officers used more force than

was required, by twisting his genitals, punching him with a pair of handcuffs, and slamming his head on the floor. Likewise, as to the December 5, 2012, incident, a cell extraction was again warranted, after Plaintiff shattered the window of his cell door. Plaintiff contends that the officers used excessive force during the extraction. To the extent that Bishop or Humphrey may have authorized or ordered the uses of force, their authorization was justified by the facts, and there is no evidence that either of them directed the officers to use more force than necessary.

The evidence shows instead that there were institutional procedures in place to prevent excessive uses of force. The two cell extractions, on February 22, 2012, and on December 5, 2012, were video recorded. Plaintiff's own exhibits show that as the Deputy Warden of SMU, Bishop was notified of both the February 22 and December 5 incidents through a standard Incident Report, which listed the name and Employee ID number of each staff member involved. See Pl.'s Ex. 8, Incident Report (Doc. 142-10, p. 2) and Pl.'s Ex. 10, Incident Report (Doc. 142-12).[24] All three incidents were reviewed by both Bishop and Humphrey and referred to Internal Affairs for formal investigation. In the absence of evidence that Bishop or Humphrey themselves acted unlawfully or knew that their subordinates would act unlawfully and failed to stop them, Plaintiff cannot sustain a supervisory liability claim against them.

### E. Damages sought under the PLRA

Defendants also argue that the presented evidence shows Plaintiff's injuries were not greater than the *de minimis* standard set out by the Eleventh Circuit, and that Plaintiff's request for compensatory and punitive damages should be dismissed. Doc. 161-1, pp. 13-15.

Pursuant to § 1997e(e), "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." 42 U.S.C. §

---

[24] The record reflects that a different deputy warden reviewed the incident report for the February 3 incident.

1997e(e). Although section 1997e(e) does not define what constitutes a physical injury, the Eleventh Circuit has concluded that in order to satisfy the statute "the physical injury must be more than *de minimis,* but need not be significant." *Harris v. Garner*, 190 F.3d 1279, 1286 (11th Cir. 1999), vacated in part on other grounds, 216 F.3d 970 (11th Cir. 2000) (en banc); *see also Mitchell v. Brown & Williamson Tobacco Corp*., 294 F.3d 1309, 1312–1313 (11th Cir. 2002) ("In order to avoid dismissal under § 1997e(e), a prisoner's claims for emotional or mental injury must be accompanied by allegations of physical injuries that are greater than de minimis.") (citation omitted). Thus, in the Eleventh Circuit, it is clear that a prisoner must establish more than a *de minimis* physical injury to recover compensatory and punitive damages for any *mental or emotional* injury suffered. *See Mitchell*, 294 F.3d at 1312–13 (§ 1997e(e) requires showing of more than *de minimis* physical injury in order for plaintiff to proceed on claim for mental or emotional injury). The Eleventh Circuit has also noted that "[t]he meaning of the phrase 'greater than de minimis' . . . is far from clear." *Chatham v. Adcock*, 334 F. App'x. 281, 284 (11th Cir. 2009).

On March 17, 2015, this Court granted Plaintiff's Motion to Amend to allow Plaintiff to clarify the amount of damages he seeks in this action. See Doc. 103. In that Motion, Plaintiff requested: "$100,000 compensatory damages against each Defendant in their individual capacity; [and] $100,000 punitive damages against each defendant in their individual capacity." Doc. 96-1, p. 11. Plaintiff also argued in his response to Defendants' Motion for Summary Judgment that the damages are for the actual injuries caused by the Defendants. Doc. 164-1, p. 11. This Court can find no authority limiting a prisoner's damages for the actual physical injury he may have suffered, even if the court determines the injury was *de minimis*. Section 1997e(e) only bars recovery for mental or emotional injury, and the Eleventh Circuit has held that "[c]ompensatory damages under § 1983 may be awarded [ ] based on *actual injuries* caused by the defendant...." *Williams v. Brown*,

347 F. App'x. 429, 436 (11th Cir. 2009) (emphasis in the original) (citing *Slicker v. Jackson*, 215 F.3d 1225, 1229 (11th Cir. 2000)).

Further, genuine issues of material fact exist as to the extent of Plaintiff's injuries, and finding Plaintiff's injuries *de minimis* at this stage of the case would be inappropriate. Specifically, Defendants emphasize that Plaintiff only received "a few minor abrasions, a bruise, and scratches to his knees and left leg" as a result of the Defendants use of force and that he only needed minor medical treatment. Doc. 161-2, p. 15. However, as laid out above, Plaintiff disputes this characterization of his injuries and states that in addition to the lacerations and initial bruises noted in the medical review, he also suffered lasting effects including swelling in his face and head; bruises throughout his head, face, and shoulders; lasting physical pain; serious glass cuts; and involuntary muscle spasms. Other courts have found injuries similar to those alleged by Plaintiff to be adequate to recover under the PLRA. See, e.g., *Munn v. Toney*, 433 F.3d 1087, 1089 (8th Cir. 2006) (holding that plaintiff's allegations of headaches, cramps, nosebleeds, and dizziness, resulting from denial of prescribed blood pressure treatment, survived Section 1997e(e) review); *Cotney v. Bowers*, No. 2:03–CV–1181–WKW, 2006 WL 2772775, at \*7 (M.D.Ala. Sept. 26, 2006) (finding that plaintiff's allegations of bruised ribs after use of force surmounted Section 1997e(e)'s bar, as plaintiff put forth evidence from which a jury could determine that his physical injuries were more than de minimis).

Given the factual disputes regarding the injuries that Plaintiff received from the Defendants' use of force, the Court should not conclude as a matter of law that Plaintiff's injuries were *de minimis*, and cannot grant summary judgment Plaintiff's request for damages pursuant to Section 1997e(e) as Defendants insist.

**F. Injunctive Relief**

Plaintiff also seeks an injunction against Defendants Humphrey and Bishop, prohibiting them from the use of force on Plaintiff, unless necessary.[25] Doc. 1 at 10. The PLRA requires that Courts "narrowly tailor" remedies in order to correct the specific violations of the rights of particular plaintiffs with the "least intrusive means." See 18 U.S.C. § 3626(a)(1). Nevertheless, federal courts "may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown v. Plata*, 563 U.S. 493, 511 (2011).

In the instant case, as Plaintiff's claims against Humphrey and Bishop are subject to judgment as a matter of law, injunctive relief against them would not be available. Further, Plaintiff's request for a prohibition on all unnecessary uses of force is not an appropriate injunctive remedy, as the Court cannot issue a general injunction barring a defendants from violating the law at some point in the future. See *SEC v. Smyth*, 420 F.3d 1225, 1233 (11th Cir. 2005) ("This circuit has repeatedly held that 'obey the law' injunctions are unenforceable."); *Payne v. Travenol Lab., Inc.*, 565 F.2d 895, 898 (11th Cir. 1978) ("'[O]bey the law' injunctions cannot be sustained."); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1999). Consequently, the Court should grant Defendants' Motion for Summary Judgment as to Plaintiff's claims for injunctive relief.

**G. Defendant Walker**

Plaintiff recognizes in his Motion for Summary Judgment that he no longer wants to pursue his claims against Walker, stating that contrary to the allegation in his complaint, the evidence shows that Walker did not use excessive force against him on February 22, 2012. Doc. 142-1, p. 2. Defendant Walker, by separate Motion, moves this Court to grant summary judgment on

---

[25] Plaintiff has previously requested a preliminary injunction and a temporary restraining order which were denied by the Court. Docs. 91; 99.

Plaintiff's claims against him, as Walker did not use excessive force against him, and Plaintiff indicated that longer wished to pursue any claim against Defendant Walker. Doc. 162. Pursuant to Rule 56, Defendant Walker is entitled to judgment as a matter of law as Plaintiff has not shown a genuine issue of material fact as to Walker's alleged use of excessive force on February 22, 2012. Thus, Defendant Walker's Motion for Summary Judgment must be **GRANTED**.

<u>CONCLUSION</u>

For the reasons stated above, it is **RECOMMENDED** that the Motion for Summary Judgment of Defendants Bishop, Clupper, Cooper, Daniels, Hill, Humphrey, Jackson, Kyles, Mabry, Means, Oneal, Russo, Walters, Wesley, Wilkins, and Williams' be **GRANTED in part**, as to Plaintiff's supervisory liability claims and requests for injunctive relief against Bishop and Humphrey; that Plaintiff's Motion for Summary Judgment be **DENIED**, and that the case proceed to trial on Plaintiff's excessive force and failure to intervene claims.

It is **FURTHER RECOMMENDED** that Defendant Walker's Motion for Summary Judgment be **GRANTED**.

Pursuant to 28 U.S.C. 636(b)(1), the parties may serve and file written objections to this **RECOMMENDATION** with the District Judge to whom this case is assigned **WITHIN FOURTEEN (14) DAYS** after being served with a copy thereof.

The parties are further notified that, pursuant to Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."

**SO RECOMMENDED**, this 19th day of May, 2016.

s/ Charles H. Weigle
Charles H. Weigle
United States Magistrate Judge